The REGIONAL AIRLINE PILOTS ASSOCIATION; James Bishop, Plaintiffs–Appellants,

v.

WINGS WEST AIRLINES, INC., dba American Eagle, Defendant–Appellee.

No. 89–15335.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 20, 1990.

Decided Oct. 9, 1990.

David A. Rosenfeld, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., for plaintiffs-appellants.

Alexander P. Madar, Fort Worth, Tex., Barbara S. de Oddone, Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., Richard A. Malahowski and Maureen F. Moore, Fort Worth, Tex., for defendant-appellee.

Before HUG, and SCHROEDER, Circuit Judges, and VON DER HEYDT,[*] District Judge.

HUG, Circuit Judge:

The central issue in this case is whether the airline's unilateral change in working conditions, immediately after the union's certification as representative of the airline's employees but before the collective bargaining process had begun, was a violation of section 2, First through Fourth of the Railway Labor Act ("RLA"), 45 U.S.C. § 152, First through Fourth (1982). The change in working conditions involved a change in travel pass privileges. The district court held that because this was a "minor dispute" to which the arbitration provisions of the RLA applied, it lacked jurisdiction to consider the matter. We hold that there is federal court jurisdiction to consider the application of section 2, First through Fourth, but affirm on the basis that the complaint fails to state a claim for relief.

## I.  *Facts*

Wings West is an airline carrier within the meaning of section 1, First of the RLA, 45 U.S.C. § 151, First. Regional Airline Pilots Association ("RAPA") is a labor union, certified on September 13, 1988 by the National Mediation Board as the representative of the Wings West pilots.

RAPA and one of its members, pilot James Bishop, alleged in the First Amended Complaint that during the period when the National Mediation Board was conducting an election to determine whether RAPA would represent the pilots, Wings West "failed and refused to provide pilots" certain travel benefits which had been previously promised.[1] Specifically, the complaint alleged that Wings West had promised to provide pilots a "D–2 Annual Pass Card," but that Wings West failed to provide the D–2 passes in order to induce the pilots not to join, organize, assist in organizing, or remain members of RAPA, and

that this was in violation of provisions of the RLA. *See* 45 U.S.C. § 151, Fourth.

The second part of the complaint concerned conduct occurring after RAPA was certified as the union. The complaint alleged that on September 29, sixteen days after RAPA's certification, Wings West withdrew certain other pass privileges, which had previously been given to the pilots. The complaint alleged that the changes were:

> done without bargaining with a certified representative, and without exerting every reasonable possible effort to make an agreement concerning working conditions, without considering the dispute in conference, ... [the changes were made] in order to interfere with the rights of pilots to organize and bargain collectively through representatives.

The complaint alleged that withdrawing the pass benefits was a violation of section 2, First, Second, Third and Fourth of the RLA.

Overall, RAPA's complaint sought damages for the denial of the D–2 passes prior to certification and injunctive relief to restore those benefits withdrawn on September 29, after certification, as well as damages for the withdrawal of those benefits.

The district court granted summary judgment in favor of Wings West on the grounds that it lacked jurisdiction because the dispute at issue was either a "minor dispute" or a "representational dispute."

## II.  *Minor Dispute*

After reviewing the First Amended Complaint on its merits, the district court held that the dispute was properly classified as a minor dispute, over which the National Mediation Board has exclusive jurisdiction.

The Supreme Court recently held that when determining if a dispute is minor,

> [one] looks to whether a claim has been made that the terms of an existing agreement either establish or refute the pres-

---

[*] The Honorable James A. von der Heydt, Senior United States District Judge for the District of Alaska, sitting by designation.

1. With respect to Bishop, the complaint was brought as a class action and RAPA brought the action in a representative capacity on behalf of the pilots.

ence of a right to take the disputed action. The distinguishing feature of [a minor dispute] is that the dispute may be conclusively resolved by interpreting the existing agreement.

*Consolidated Rail Corp. v. Ry. Labor Exec. Ass'n,* — U.S. ——, 109 S.Ct. 2477, 2481, 105 L.Ed.2d 250 (1989). *See also Elgin, Joliet & E. Ry. Co. v. Burley,* 325 U.S. 711, 722–23, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886 (1945) (minor disputes are controversies which involve the application or interpretation of an existing collective bargaining agreement); *Switchmen's Union of N. Am. v. Southern Pac. Co.,* 398 F.2d 443, 447 (9th Cir.1968) ("where the position of one or both of the parties is expressly and arguably predicated on the terms of the agreement, ... the question ... involves a minor dispute").

Here, no agreement existed, or had ever existed, so the dispute could not be "conclusively resolved by interpreting the existing agreement." Therefore, we find that the district court erroneously labeled the dispute as a minor dispute.

### III. *Representational Dispute*

The district court alternatively found that it lacked jurisdiction because the dispute was representational. Both parties agreed at oral argument that because RAPA was certified by the Board on September 13, 1988, RAPA's claims of interference and discrimination during the representational election became moot upon RAPA's certification.

### IV. *Section 2, First and Second*

RAPA contends that the change in pass benefits after September 19 was a violation of section 2, First and Second because Wings West did not use the bargaining process and, in fact, distorted the bargaining process by a pre-bargaining reduction in benefits. Wings West, on the other hand, contends that since no collective bargaining agreement had ever been in

effect, it was entitled to exercise its management prerogative of changing working conditions and that the district court lacked jurisdiction to interfere with these changes.

Wings West notes that section 6 of the RLA, 45 U.S.C. § 156, does contain a specific prohibition against the carriers changing the status quo with regard to pay and working conditions pending completion of the bargaining process. However, it observes that this section, by its terms, only applies to situations when a collective bargaining agreement is in effect and the carrier intends to make the change at the termination of the agreement.[2] *See Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union,* 396 U.S. 142, 158, 90 S.Ct. 294, 303–04, 24 L.Ed.2d 325 (1969); *Williams v. Jacksonville Terminal Co.,* 315 U.S. 386, 400, 62 S.Ct. 659, 668, 86 L.Ed. 914 (1942).

RAPA acknowledges that section 6 does not apply. However, RAPA still contends that the statutory mandate of section 2, First and Second of the RLA requires a carrier to resort to the bargaining process before instituting unilateral changes.

The RLA, section 2, First and Second, states:

First. Duty of carriers and employees to settle disputes

It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

Second. Consideration of disputes by representatives

All disputes between a carrier or carriers and its or their employees shall be

---

**2.** Section 6 of the RLA, 45 U.S.C. § 156, reads:

Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of the conference between the representatives of the parties....

considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute.

RAPA asserts that the federal courts have jurisdiction to enforce these sections and that it is contrary to the spirit of these provisions to permit unilateral changes before the bargaining starts. Thus, RAPA contends that it is within the jurisdiction of the federal courts to prevent such activity by the carrier, as being disruptive of the bargaining process. It is clear that under the National Labor Relations Act ("NLRA") such a unilateral change in working conditions by an employer before the bargaining process began would be an unfair labor practice to be remedied by the NLRB. *See NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). However, we must be careful in transposing concepts from the NLRA to its predecessor, the RLA.

In the NLRA, an administrative agency is provided that develops expertise in overseeing this bargaining process with the authority to issue orders enforceable by the federal courts to rectify unfair practices. The RLA, on the other hand, does not provide for such an agency. The Mediation Board is not such an agency. Its designated function is to mediate and not to order one party or the other to take or decease from action. *See Airline Pilots Ass'n, Int'l v. Transamerica Airlines, Inc.*, 817 F.2d 510, 513 (9th Cir.), *cert. denied*, 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987). Even in the one designated area of jurisdictional disputes, in which the Board is authorized to make a final decision, Congress took special precautions to allow appointment of a separate committee to make decisions on certification so as not to jeopardize the Board's primary function as a neutral in the mediation process. *See Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 580–81, 91 S.Ct. 1731, 1736–37, 29 L.Ed.2d 187 (1971) (citing S.Rep. No. 1065, 73d Cong., 2d Sess., p. 3).

■ We find that the federal courts definitely have the authority to assure the implementation of section 2, First through Fourth, in order to carry out congressional intent. *See Transamerica Airlines*, 817 F.2d at 513. The question is how much intrusion into the bargaining process is proper under the mandate of those provisions. It is doubtful that Congress intended the federal courts to operate as the NLRB does under the detailed statutory prescriptions of the NLRA. The language of section 2, First through Fourth, is very general, leaving the impression that the federal courts' obligation is to oversee the broad structure of the process and prevent major deviations, not to be involved in particulars of the bargaining process.

Wings West relied heavily on *Williams*, in which the Supreme Court faced a factual situation very similar to this and declined to step into the bargaining process. In *Williams*, no collective bargaining agreement existed and a union had been recently certified. The new union had requested a conference to negotiate for an initial agreement which would include the accounting for tips. Despite this fact, the employer unilaterally changed how employees would account for their tips. The Court concluded:

> Because the carrier was, by the [Railway Labor] Act, placed under the duty to exert every effort to make collective agreements it does not follow that, pending those negotiations, where no collective bargaining agreements are or have been in effect, the carrier cannot exercise its authority to arrange its business relations with its employees in the manner shown in this record. As we have stated in discussing the *Jacksonville* case, the Railway Labor Act dealt with collective bargaining agreements only, and not with the employment of individuals.

*Williams*, 315 U.S. at 402, 62 S.Ct. at 669. Hence, in *Williams*, the carrier was permitted to make unilateral changes in rates of pay, rules or working conditions.

The Supreme Court, in *Chicago & N.W. Ry.*, distinguished *Williams* and enjoined a strike in order to enforce the duty to bar-

gain as mandated by section 2, First. In that case, the parties had exhausted the formal procedures of the RLA and the union threatened to strike. The Court held that Congress "intended the enforcement of § 2 First to be overseen by appropriate judicial means," and enjoined the strike. *Chicago & N.W. Ry.*, 402 U.S. at 581, 91 S.Ct. at 1737. The majority opinion drew a careful line in this regard. The majority found that an injunction under section 2, First, was proper to prevent a strike when it was

> the only practical, effective means of enforcing the duty to exert every reasonable effort to make and maintain agreements....

*Id.* at 583, 91 S.Ct. at 1738. The dissenting opinion, written by Justice Brennan, and joined by Justices Black, Douglas, and White, emphasized the concern of those Justices that this was undue interference with the bargaining process.

The majority opinion reconciled this concern, emphasizing that only in rare occasions should the court interfere: "[T]he policy of the Act suggests that the courts should hesitate to fix upon the injunctive remedy for breaches of duty owing under the labor laws unless that remedy alone can effectively guard the plaintiff's right." *Id.* at 582, 91 S.Ct. at 1737 (citation omitted).

The D.C. Circuit, in *International Ass'n of Machinists v. Trans World Airlines, Inc.*, 839 F.2d 809 (D.C.Cir.), *amended*, 848 F.2d 232 (per curiam), *cert. denied*, 488 U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988), addressed a situation similar to the one before us wherein the union had been certified by the National Mediation Board, and the district judge had ordered the carrier to commence bargaining and enjoined prospective unilateral changes in the working conditions. The carrier appealed and contended that the injunction could not properly be entered by the district court. The circuit court noted that the issue fell within the direct proscriptions of *Williams* but discerned the weakening of that strict proscription in the holding of the Court in *Chicago & N.W. Ry.*

The D.C. Circuit opinion stated:

> [T]he *Williams* case holding, though weakened, is not dead.... The independent duty found by the Court under Section 2, First, in the *Chicago and North Western* case is a limited one. The Court expressly held that the injunctive remedy would be available only "where a strike injunction is the only practical, effective means of enforcing the command of § 2 First." Plainly, the same restrictive test should apply in enjoining self-help by management.

*Trans World Airlines*, 839 F.2d at 814 (citation omitted). The D.C. Circuit went on to point out that in *Chicago & N.W. Ry.* all of the procedures for negotiations, mediation, and the period for cooling off had been attempted and failed, and a strike was imminent before resort was had to the injunctive measure. Here, as in the D.C. Circuit case, no steps toward bargaining, mediation, or the other steps provided in the Act to assist the bargaining process had been undertaken. We agree with the D.C. Circuit that the interjection of the federal courts in the bargaining process is not authorized by section 2, First, as interpreted by *Williams* and *Chicago & N.W. Ry.* We only differ with the D.C. Circuit in that we do not conclude that this is a jurisdictional ruling. Our view is that jurisdiction exists to enforce section 2, First through Fourth, but that the prerequisites for stating a claim under the authority of *Chicago & N.W. Ry.* do not exist under the facts of this case where there has been no negotiation process instituted at all.

## V. *Conclusion*

The district court had jurisdiction under section 2, First through Fourth, but the complaint fails to state a claim for relief.

AFFIRMED.