924 F.2d 1005
 136 L.R.R.M. (BNA) 2686, 118 Lab.Cas. P 10,580
 INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE
WORKERS; District 100, International Association
of Machinists and Aerospace Workers,
Plaintiffs-Appellees,
v.
TRANSPORTES AEREOS MERCANTILES PAN AMERICANDOS, S.A., a/k/a
Tampa Airlines, Defendant-Appellant.
 No. 89-5912.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 27, 1991.
 
 Stuart A. Goldstein, Law Offices of Stuart A. Goldstein, Miami, Fla., for defendant-appellant.
 Jeffrey P. Manners, Law Office of Jeffrey P. Manners, P.A., Miami, Fla., for plaintiffs-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before HATCHETT and ANDERSON, Circuit Judges, and ESCHBACH*, Senior Circuit Judge.
 ANDERSON, Circuit Judge:
 
 
 1
 Appellant Transportes Aereos Mercantiles Pan Americanos, S.A., a/k/a Tampa Airlines ("Tampa Airlines") appeals from the district court's order granting a preliminary injunction in favor of appellees International Association of Machinists and Aerospace Workers ("IAM") and District 100, IAM. Relying on Sec. 2 First of the Railway Labor Act (RLA), 45 U.S.C. Sec. 152 First, the district court enjoined Tampa Airlines from making unilateral changes in working conditions during negotiations directed toward reaching a collective bargaining agreement. The district court also ordered that Tampa Airlines restore the working conditions to the status quo before certain unilateral changes were made. Appellant argues that the district court misapplied the Railway Labor Act and its attendant case law and that the injunction was an inappropriate remedy.
 
 I.
 
 2
 The district court found the following undisputed facts after conducting a hearing. On July 15, 1987, appellee IAM was elected to succeed the Teamsters Union as the exclusive bargaining representative for the fleet service employees of appellant Tampa Airlines.[1] During the Teamsters' tenure as the employees' representative, collective bargaining had produced a tentative agreement regarding rates of pay, rules, and working conditions. Although that agreement was never finalized or ratified, Tampa Airlines informed IAM, at the October 2, 1987 commencement of bargaining between IAM and Tampa Airlines, that such agreement contained the existing rates of pay, rules, and working conditions, i.e., the status quo.[2]
 
 
 3
 In May, 1988, Tampa Airlines fired several union employees without regard to previously extant seniority rules and informed the union that there was no grievance procedure in existence to challenge the firings. District Court Order, R1-32-3. Also in May, 1988, management fired the shop steward, allegedly on the grounds that, although he was a good employee, his position with the union would not be tolerated and that management would not respect the union or its members' rights.
 
 
 4
 IAM responded by filing the instant action alleging bad faith on the part of Tampa Airlines in connection with the ongoing collective bargaining negotiations. Despite the onset of litigation, collective bargaining continued until January, 1989, when Tampa Airlines refused to negotiate further with IAM. Tampa Airlines subsequently made additional unilateral changes, including stopping without notification contributions to the employees' dependent group medical insurance coverage, decreasing certain employee bonuses, decreasing flight crews, increasing flights per day, and laying off more employees. IAM amended its complaint to encompass these additional changes.
 
 II.
 
 5
 In 1926, Congress enacted the Railway Labor Act, 45 U.S.C. Secs. 151-188, for the following stated purposes:
 
 
 6
 (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.
 
 
 7
 45 U.S.C. Sec. 151a.
 
 
 8
 The purposes of the act are facilitated by an elaborate statutory scheme designed to encourage negotiation and mediation rather than conflict resulting in the interruption of interstate commerce. Essential to this scheme is the duty to bargain in good faith codified in Sec. 2 First of the Act, 45 U.S.C. Sec. 152 First, providing that:
 
 
 9
 It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.
 
 
 10
 Section 2 First is not merely hortatory; it imposes judicially enforceable legal obligations. See Chicago & North Western Ry. Co. v. United Transport Union, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971). Furthermore, the Supreme Court has held that Sec. 2 First, together with other provisions of the Railway Labor Act, "form an integrated, harmonious scheme for preserving the status quo from the beginning of the major dispute[3] through the final 30-day 'cooling-off' period." Detroit & Toledo Shore Line Ry. Co. v. United Transportation Union, 396 U.S. 142, 152, 90 S.Ct. 294, 300, 24 L.Ed.2d 325 (1969).
 
 
 11
 The question presented here is whether the obligation to bargain in good faith of Sec. 2 First precludes management from making unilateral changes in working conditions after the onset of negotiations directed toward adoption of an initial collective bargaining agreement. Tampa Airlines asserts that it does not, at least in the absence of a pre-existing collective bargaining agreement. In light of the history of prior collective bargaining between the parties, and notwithstanding the fact that there was no prior collective bargaining agreement in effect, we conclude that the district court properly restored the status quo and enjoined Tampa Airlines from making future unilateral changes.
 
 
 12
 In Williams v. Jacksonville Terminal Co., 315 U.S. 386, 403, 62 S.Ct. 659, 669, 86 L.Ed. 914 (1942), the Supreme Court declared that the Railway Labor Act's status quo provisions were "aimed at preventing changes in working conditions previously fixed by collective bargaining agreements." In other words, "pending ... negotiations, where no collective bargaining agreements are or have been in effect, the carrier" is free to make unilateral changes. Id. at 402, 62 S.Ct. at 669. However, the Supreme Court severely circumscribed the Williams holding in Detroit & Toledo Shore Line Ry. Co. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969).
 
 
 13
 In Detroit & Toledo, the Court held that the status quo provisions obligate both union and management to maintain not only the working conditions contained in an existing collective bargaining agreement, but also "those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." Id. at 153, 90 S.Ct. at 301. The Court added: "[C]learly these conditions need not be covered in an existing agreement." Id. The rationale for this holding is that if management is permitted to resort to self-help before exhaustion of the Act's negotiation and mediation procedures, "the union cannot be expected to hold back its own economic weapons, including the strike." Id. at 155, 90 S.Ct. at 302. In addition, "[u]nilateral changes made while the employees' representative is seeking to bargain ... interfere with the normal course of negotiations by weakening the union's bargaining position." Cox, The Duty to Bargain in Good Faith, 71 Harv.L.Rev. 1401, 1423 (1958).
 
 
 14
 In Detroit & Toledo, the union invoked Sec. 6 of the Act, 45 U.S.C. Sec. 156,[4] which, along with Sec. 5 First and Sec. 10, 45 U.S.C. Secs. 155 First, 160, comprises the status quo portion of the Act. Detroit & Toledo at 150-51, 90 S.Ct. at 299-300. In this appeal, however, none of these three provisions has been invoked.[5] This raises a question specifically left open by Detroit & Toledo: whether Sec. 2 First's duty to bargain in good faith, standing alone, precludes unilateral changes after negotiations have commenced.[6] We conclude that it does.
 
 
 15
 Although the Williams holding by itself might have required the opposite result in this case, Detroit & Toledo, has limited Williams ' allowance of unilateral changes to the narrow situation where there is "absolutely no prior history of any collective bargaining or agreement between the parties on any matter." Detroit & Toledo 396 U.S. at 158, 90 S.Ct. at 303 (emphasis added). In the instant case, collective bargaining between the Teamsters and Tampa Airlines as well as bargaining involving IAM had already occurred at the time that Tampa Airlines made the unilateral changes at issue. Furthermore, at the time that bargaining commenced, Tampa Airlines informed IAM that the prior, unratified agreement represented the status quo. Because there was a prior history of collective bargaining here, this case does not fall within Williams ' small window of remaining vitality.[7]
 
 
 16
 Having concluded that the instant case is not controlled by Williams, as the holding of that case was narrowed in Detroit & Toledo, we next conclude that the rationale of Detroit & Toledo, combined with Chicago & North Western 's holding that Sec. 2 First provides for enforceable legal duties, precludes the unilateral changes made here. In Detroit & Toledo, there was a pre-existing collective bargaining agreement to serve as a stepping stone for an injunction defining the status quo as broader than that agreement, i.e., to encompass the actual conditions in place not covered by the agreement. Although here there was no prior formal collective bargaining agreement, the instant case implicates the identical policies behind the Detroit & Toledo holding. If management is permitted to make unilateral changes in working conditions during collective bargaining, the union's position will be undermined, interruptions to interstate commerce are likely to occur, and the purposes of the Act will be frustrated.
 
 
 17
 Tampa Airlines relies on International Ass'n. of Machinists & Aerospace Workers (IAM) v. Trans World Airlines, 839 F.2d 809 (D.C.Cir.), amended on other grounds, 848 F.2d 232 (D.C.Cir.), cert. denied, 488 U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988) for the proposition that there must be a prior collective bargaining agreement before management can be enjoined from unilaterally changing working conditions. In that case, the court held only that "Williams ... [is] binding in a case like this one before us where there has been 'absolutely no prior history of any collective bargaining or agreement between the parties on any matter.' " IAM v. Trans World Airlines at 814 (quoting Detroit & Toledo, 396 U.S. at 158, 90 S.Ct. at 303). We note that the D.C. Circuit apparently believed that the facts before it fell squarely within the remaining Williams window of vitality, i.e., no prior collective bargaining and no prior agreement. Because there was prior collective bargaining in this case, the D.C. Circuit case is distinguishable. We reject Tampa Airlines' argument that there must be a prior collective bargaining agreement before management can be enjoined from unilaterally changing working conditions. Williams was expressly limited by Detroit & Toledo to a situation where there is not only no pre-existing agreement, but also no history of collective bargaining.[8]
 
 
 18
 Our interpretation of the Railway Labor Act's duty to bargain in good faith is also supported by an analogy to cases interpreting the National Labor Relations Act (NLRA), 29 U.S.C. Sec. 141, et seq. and its duty to bargain in good faith. See 29 U.S.C. Sec. 158. Although we realize that the NLRA "cannot be imported wholesale into the railway labor arena ..." and that "[e]ven rough analogies must be drawn circumspectively ...," Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 383, 89 S.Ct. 1109, 1118, 22 L.Ed.2d 344 (1969), an analogy is appropriate in this instance because both the RLA and the NLRA require the same 'good faith' bargaining. Norfolk & Portsmouth Belt Line Ry. Co. v. Brotherhood of Railway Trainmen, 248 F.2d 34, 45 n. 6 (4th Cir.1957), cert. denied, 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed.2d 274 (1958) (citing Brotherhood of Railway Trainmen v. Toledo, Peoria & Western Railroad, 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944)). As the Supreme Court noted in Chicago & North Western, 402 U.S. at 574-75, 91 S.Ct. at 1734, the RLA's and the NLRA's duty to bargain in good faith are based on the same underlying policy: existing rates of pay, rules, and working conditions must be maintained during negotiations because "[t]he bargaining status of a union can be destroyed by going through the motions of negotiating almost as easily as by bluntly withholding recognition" of the union as the bargaining representative.
 
 
 19
 Drawing on this analogy with the NLRA, we are persuaded by the Supreme Court's reasoning in N.L.R.B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), a case interpreting the NLRA's duty to bargain in good faith. In Katz, the Court held, in a situation where there was no prior collective bargaining agreement between management and the union, that "an employer's unilateral change in conditions of employment under negotiation is [as much a violation of the duty to bargain in good faith] as ... a flat refusal [to negotiate]." Id. at 743, 82 S.Ct. at 1111. Similarly, we hold that Tampa Airlines violated the RLA's duty to bargain in good faith when it unilaterally changed existing working conditions after collective bargaining negotiations with IAM had begun.
 
 III.
 
 20
 Tampa Airlines argues that, even if it has violated RLA Sec. 2 First's duty to bargain in good faith, the district court improperly granted injunctive relief. Tampa Airlines contends that "injunctive relief under RLA Sec. 2 First [Sec. 152 First] is available only if all the procedures for negotiations, mediation and 'cooling off' period have been unsuccessfully utilized...." Brief of Appellant at 24 (emphasis in original) (quoting International Ass'n. of Machinists & Aerospace Workers (IAM) v. Trans World Airlines, 839 F.2d 809 (D.C.Cir.1988)).
 
 
 21
 Although it is true that "[c]ourts should hesitate to fix upon the injunctive remedy ... unless that remedy alone can effectively guard the plaintiff's right," IAM v. Trans World Airlines, 839 F.2d at 815 (quoting Burlington Northern R.R. v. BMWE, 481 U.S. 429, 446, 107 S.Ct. 1841, 1851, 95 L.Ed.2d 381 (1987) (quoting IAM v. Street, 367 U.S. 740, 773, 81 S.Ct. 1784, 1802, 6 L.Ed.2d 1141 (1961)), we are not persuaded by the argument that an injunction should not issue unless the very procedures that are being undermined by the unilateral changes are exhausted. Without enjoining future unilateral changes and restoring the prior conditions, the very procedures that Tampa Airlines suggests must be first pursued will be undermined.
 
 
 22
 Both IAM v. Trans World Airlines, 839 F.2d at 815, and the Ninth Circuit's opinion in Regional Airline Pilots Ass'n. v. Wings West Airlines, Inc., 915 F.2d 1399 (9th Cir.1990) contain language which might be interpreted as supporting Tampa Airlines' position that an injunction cannot issue until all RLA procedures have been exhausted. To the extent that those cases so hold, we respectfully disagree. Such a position would be a misapplication of Chicago & North Western. Nothing in that opinion suggests a rule that an injunction should issue only after all RLA procedures are exhausted. Rather, Chicago & North Western merely held that a strike injunction should issue only where it is the only "practical, effective means of enforcing the duty to exert every reasonable effort to make and maintain agreements...." Chicago & North Western, 402 U.S. at 583, 91 S.Ct. at 1738.
 
 
 23
 In fact, the rule suggested by Tampa Airlines is inconsistent with important policies underlying the RLA. It is well established that the RLA is designed to preserve the status quo and to discourage resort to self-help during the time that the RLA procedures are being pursued; thereafter, resort to self-help is generally permissible. Thus, contrary to the rule urged by Tampa Airlines, an order enjoining self-help is more appropriate, not less appropriate, before ll of the RLA procedures are exhausted.[9]
 
 
 24
 The test established in Chicago & North Western, 91 S.Ct. at 1738, for determining whether to enjoin the unilateral changes is whether an injunction is the only practical, effective means of enforcing the duty to bargain in good faith expressed in Sec. 2 First. In Chicago & North Western, the unilateral action sought to be enjoined was a strike, thus triggering the prohibition against strike injunctions found in the Norris-Laguardia Act, 29 U.S.C. Sec. 104(a). We need not decide whether a less restrictive test should apply in the instant case, which does not involve a strike injunction, because the Chicago & North Western test is readily satisfied here. In the instant case, we have held that Tampa Airlines has not exerted reasonable efforts to bargain in good faith. Since the unilateral changes made by Tampa Airlines will inevitably undermine IAM's bargaining position, we cannot conclude that other remedies, short of an injunction, would be effective. During the course of bargaining and after refusing to bargain further with IAM, Tampa Airlines fired numerous employees and unilaterally made changes in working conditions, including changes involving several significant fringe benefit programs. Such action by Tampa Airlines could only serve to undermine the union members' confidence in IAM, their bargaining representative, and to undermine the ability of IAM to bargain on a fair and equal basis with management. Under these circumstances, it was entirely appropriate for the district court to fashion an injunction so that fair negotiations could continue under the RLA procedures. Any collective bargaining agreement that might result from further negotiations in the absence of an injunction would almost surely be the product of decreased union bargaining strength. Thus, an injunction is the only practical and effective remedy here.
 
 
 25
 Therefore, the district court's order enjoining further unilateral changes and restoring the conditions that existed before Tampa Airlines made such changes is
 
 AFFIRMED.[10]
 
 
 *
 Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 Tampa Airlines is a common carrier by air as defined by the Railway Labor Act, 45 U.S.C. Secs. 151, 181
 
 
 [2]
 Tampa Airlines defines the status quo as "that rates of pay, rules and working conditions were changed by management at its discretion to meet Tampa's needs." Brief of Appellant at 4 and 11 (relying on Affidavit of Rodrigo Arboleda, R1-27-5). A reading of the proferred affidavit reveals that the affiant stated only that management had not bound itself not to make unilateral changes by a collective bargaining agreement and that management had made certain unspecified changes after reaching the tentative agreement with the Teamsters. Tampa Airlines does not contend, however, that the district court's finding that management had informed IAM that the unratified agreement represented the existing conditions was in error. Therefore, we accept the district court's definition of the status quo
 In addition, as the district court noted, "[t]here were two provisions of the unratified agreement that the union admits were not part of the rates of pay, rules and working conditions ...: the union security clause and the dues checkoff clause." R1-32-3 at n. 1. Those provisions are not at issue here.
 
 
 [3]
 The district court properly classified the instant case as a major dispute. R1-32-5 (citing Elgin, J. & E.R. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945)). This determination is not at issue on appeal. For a good discussion of the distinction between major and minor disputes under the Railway Labor Act, see generally Sheet Metal Workers' Intern. Ass'n. v. Burlington No. Ry. Co., 893 F.2d 199, 202-04 (8th Cir.1990)
 
 
 [4]
 15 U.S.C. Sec. 156 states:
 Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.
 
 
 [5]
 IAM requested relief under both Sec. 2 First and Sec. 6 in their original complaint, but has relied on Sec. 2 First alone on this appeal. It is questionable whether Sec. 6 could be properly invoked here because Sec. 6 may only apply where there is an intended change in an existing, formal collective bargaining agreement. Detroit & Toledo involved a situation where there was such an agreement and the Court held that once Sec. 6 is invoked, the status quo that must be maintained includes not only what is in the existing agreement, but also the actual working conditions in place, even if those conditions fall outside of the existing agreement. We need not decide whether the tentative agreement reached by management and the Teamsters in the instant case is an agreement within the meaning of Sec. 6 because, as discussed below in text, we conclude that Sec. 2 First precludes the unilateral changes made here despite the lack of a formal agreement in light of the history of prior collective bargaining between the parties
 
 
 [6]
 In Detroit & Toledo, the union argued that the railroad violated the duty to bargain in good faith. The Court declined to reach that argument because it resolved the case on the basis of Sec. 6. Detroit & Toledo, 396 U.S. at 155 n. 23, 90 S.Ct. at 302 n. 23
 
 
 [7]
 In fact, the Detroit & Toledo case questioned whether Williams has any remaining vitality. Detroit & Toledo at 158, 90 S.Ct. at 303. Because there was prior collective bargaining in this case, we need not address the continuing validity of Williams
 
 
 [8]
 The Ninth Circuit, apparently reading the D.C. Circuit's IAM v. Trans World Airlines case as does Tampa Airlines, said: "We ... differ with the D.C. Circuit in that ... [o]ur view is that jurisdiction exists to enforce section 2, First through Fourth, but that the prerequisites for stating a claim under authority of Chicago & N.W. Ry. do not exist under the facts of this case where there has been no negotiation process instituted at all." The Regional Airline Pilots Ass'n v. Wings West Airlines, Inc., 915 F.2d 1399, 1403 (9th Cir.1990). Thus, the Ninth Circuit appears to be in accord with our holding that unilateral changes in working conditions can be enjoined when there has been prior bargaining
 
 
 [9]
 If, as Tampa Airlines and the D.C. Circuit suggest, Chicago & North Western provided support for the proposition that an injunction is appropriate only after all RLA procedures have been exhausted, then Chicago & North Western would be inconsistent with the above-mentioned policies underlying the RLA. However, a careful reading of Chicago & North Western reveals that there is no such inconsistency. The Supreme Court did note early in their opinion that "[f]or present purposes it is sufficient to observe that the parties have exhausted the formal procedures of the Railway Labor Act...." Chicago & North Western, 91 S.Ct. at 1733. However, the court later remarked, after holding that Sec. 2 First imposes a legal obligation on the parties, that the union went "through the motions [of the RLA procedures] with 'a desire not to reach an agreement' " Id. at 1736 (citation omitted). Thus, in Chicago & North Western, the RLA procedures had not been exhausted, i.e., the RLA procedures had not been performed in conformity with Sec. 2 First's duty to bargain in good faith. Therefore, Chicago & North Western provides no support for the rule proposed by Tampa Airlines, not only for the reasons stated in the text, but also because that case did not present a situation where all of the RLA procedures, including Sec. 2 First, had been exhausted
 
 
 [10]
 At oral argument, Tampa Airlines also argued that the district court erred in failing to fix a bond. We conclude that Tampa Airlines did not fairly present this issue in its brief, and therefore we decline to address it