926 F.Supp. 869 (1996)
AUTOMOTIVE, PETROLEUM AND ALLIED INDUSTRIES EMPLOYEES UNION, LOCAL 618, affiliated with the International Brotherhood of Teamsters, AFL-CIO, Plaintiff,
v.
TRANS STATES AIRLINES d/b/a Trans World Express, Defendant.
No. 4:95CV515-DJS.
United States District Court, E.D. Missouri, Eastern Division.
May 22, 1996.
*870 Clyde E. Craig, Mark A. Potashnick, Craig and Nangle, Brentwood, MO, for plaintiff.
James N. Foster, Jr., McMahon and Berger, St. Louis, MO, E. Scott Smith, Leanne C. Groce, Ford and Harrison, Atlanta, GA, for defendant.

ORDER
STOHR, District Judge.
Plaintiff Local 618 is the certified bargaining representative of defendant Trans States Airlines' flight attendants. Plaintiff brings the instant complaint alleging that defendant has violated § 2 Fourth of the Railway Labor Act ("RLA"), 45 U.S.C. § 152 Fourth, by "den[ying] compensation increases to Defendant's flight attendants represented by Plaintiff to discourage union membership and activities." Complaint, ¶ 7. The matter is now before the Court on cross-motions for summary judgment.
The following facts are not subject to genuine dispute. Following plaintiff's July 26, 1994 application with the National Mediation Board and the ensuing election campaign, plaintiff was certified as the exclusive bargaining representative of defendant's flight attendants on October 17, 1994. Prior to that time, defendant maintained a written policy and a practice of granting merit-based raises to its flight attendants six months after beginning employment and subsequently on each anniversary of employment through the fifth year, according to the following schedule:

 Period of Hourly
 Employment Rate 
 New Hire $10.50
 6 Months $11.50
 1 Year $12.50
 2 Years $13.50
 3 Years $14.25
 4 Years $15.00
 5 Years $15.75.

During the union election campaign, defendant distributed written materials to all flight attendants stating that wage increases would likely be frozen during initial contract negotiations, which might be a period of up to two years or longer.
Immediately upon union certification, Richard Leach, defendant's Vice President of Customer Service, made the decision to freeze wage increases during the initial collective bargaining negotiations with plaintiff. The 6-month raise was subsequently converted from a "merit" raise to an "automatic" raise and reinstituted, even during the pendency of initial contract negotiations. The parties began collective bargaining negotiations in June 1995; the negotiations are ongoing.
The parties agree that defendant is a "carrier" and plaintiff is a "representative" within the meaning of the Railway Labor Act. See 45 U.S.C. § 151 First & Sixth. The statutory provision upon which plaintiff's claim is based provides in pertinent part as follows:
Fourth. Organization and collective bargaining; freedom from interference by carrier....
Employees shall have the right to organize and bargain collectively through representatives of their own choosing ... No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees ... or to influence or coerce employees in any effort to induce them to join or remain or not to join or remain members of any labor organization....
45 U.S.C. § 152. The particular conduct challenged by plaintiff in its complaint is, as *871 quoted previously above, defendant's alleged denial of "compensation increases to Defendant's flight attendants represented by Plaintiff to discourage union membership and activities." Complaint, ¶ 7.
The parties' briefing of the cross-motions for summary judgment and the case law cited therein raise several threshold questions concerning the nature and scope of plaintiff's claim. Plaintiff's complaint very specifically identifies section Fourth of 45 U.S.C. § 152 and defendant's alleged denial of wage increases as the legal and factual bases, respectively, of plaintiff's claim. Plaintiff's memoranda at times suggest that it seeks relief based not on the denial of wage increases, but on defendant's statements during the pre-certification election campaign alluding to the possibility of wage freezes upon certification pending initial collective bargaining negotiations. In its responsive memoranda, defendant has expressed its objection to any such alteration of plaintiff's claim. Defendant rightly contends that plaintiff cannot now be permitted, in summary judgment memoranda and without seeking leave to amend its complaint, to so significantly alter the factual basis of its claim, at least where the attempt is opposed by defendant. In any event, plaintiff appears to concede the point, in that its later-filed memoranda steer away from arguing that defendant's pre-certification communications referencing the possibility of a wage freeze themselves constitute a violation of the RLA. For all these reasons, the Court will not further address the legality of those statements and communications, an issue not property before the Court.
The Court also notes that significant portions of the case law cited by the parties analyze not only Section Fourth of § 152, which addresses primarily initial union organization, but other provisions of § 152 as well. Unlike the factual distinction addressed above, the examination of potential liability on a different legal basis than has been pled by plaintiff is entirely appropriate, if not required, by Fed.R.Civ.P. 8(f), which requires that all pleadings be construed "as to do substantial justice." In the Court's view, justice would not be served by a refusal to consider whether the facts pled and proved constitute a violation of provisions of the Railway Labor Act other than the one initially identified by plaintiff, if such a possibility is fairly raised by the parties' treatment of the motions now before the Court.
Having thus framed the issues, the Court must determine whether defendant's suspension of annual merit raises following certification of the plaintiff union, as established by the undisputed facts, violates or does not violate the Railway Labor Act as a matter of law. In Williams v. Terminal Co., 315 U.S. 386, 62 S.Ct. 659, 86 L.Ed. 914 (1942), the Supreme Court considered whether a railroad's unilateral imposition of a new method for determining the minimum wages to be paid to "redcap" porters under the newly applicable Fair Labor Standards Act of 1938 violated any of sections First through Seventh of § 2 of the Railway Labor Act, 45 U.S.C. § 152.
The Supreme Court's highly relevant analysis will be quoted here at some length:
To assure continued operations, changes by the carriers in agreements reached through collective bargaining, pending negotiations, are prohibited. Independent individual contracts are not affected by the Act. It is to be noted that § 2 [of the Act, 45 U.S.C. § 152], First to Sixth, inclusive, relied upon by petitioners, is largely concerned with the organization of employees, freedom from carrier interference in such organization, the choice of representatives for collective bargaining, and the manner of entering into and carrying on such negotiations. Section 2, Seventh ... forbids changes of pay or working conditions of employees "as a class as embodied in agreements" except as provided in § 6 [45 U.S.C. § 156]. The crucial § 6 is phrased so as to leave no doubt that only agreements reached after collective bargaining were covered.
Id. at 399-400, 62 S.Ct. at 667-668. Furthermore:
Because the carrier was, by the Act, placed under the duty to exert every effort to make collective agreements, it does not follow that, pending those negotiations, *872 where no collective bargaining agreements are or have been in effect, the carrier cannot exercise its authority to arrange its business relations with its employees in the manner shown in this record ...
The institution of negotiations for collective bargaining does not change the authority of the carrier. The prohibitions of § 6 against change of wages or conditions pending bargaining and those of § 2, Seventh, are aimed at preventing changes in conditions previously fixed by collective bargaining agreements. Arrangements made after collective bargaining obviously are entitled to a higher degree of permanency and continuity than those made by the carrier for its own convenience and purpose.
Id. at 402-403, 62 S.Ct. at 668-669.
The Williams Court held that, because the railroad's unilateral change in wage calculation was imposed during or prior to negotiation of the first collective bargaining agreement with the newly-certified union, the change was not prohibited by any provisions of § 2 or § 6 of the Railway Labor Act. At that point in the relationship between the union and the carrier, the carrier retains authority to impose such a change, and is not subject to a requirement to maintain the status quo ante.[1] In Virgin Atlantic Airways v. National Mediation Board, 956 F.2d 1245, 1253 (2nd Cir.1992), the Second Circuit similarly interpreted Williams and held that the airline's unilateral alteration of rates of pay did not violate § 152 First or Seventh where there existed no previous collective bargaining agreement between the newly-certified union and the airline.
The Ninth Circuit reached the same conclusion in Regional Airline Pilot v. Wings West Airlines, 915 F.2d 1399 (9th Cir.1990):
The central issue in this case is whether the airline's unilateral change in working conditions, immediately after the union's certification as representative of the airline's employees but before the collective bargaining process had begun, was a violation of section 2, First through Fourth of the Railway Labor Act ... [We] affirm on the basis that the complaint fails to state a claim for relief.
Id. at 1400. See also International Ass'n of Machinists v. Trans World Airlines, Inc., 839 F.2d 809, 814 (D.C.Cir.1988) ("[N]o power to enjoin unilateral changes in working conditions by management flows from Section 6 of the Act in the absence of preexisting, in place, collective bargaining agreements.") Most recently, the Second Circuit held in Aircraft Mechanics Fraternal Association v. Atlantic Coast Airlines, Inc., 55 F.3d 90 (2nd Cir.1995), that:
[T]he essential holding of Williams remains good law and controls the outcome of this case: A newly certified union that has no collective bargaining agreement with the carrier is not entitled to a status quo freeze under the Act.
Id. at 94.
Each of these decisions treats the question as one of law, and holds that no violation of § 152 occurs where an employer unilaterally imposes a post-certification change of pay or conditions when no collective bargaining agreement has ever existed. The factual determination whether or not the employer's change in policy or practice was motivated by anti-union animus does not appear to be relevant to the legal analysis in Williams or any of the line of cases following it. Furthermore, plaintiff's citations to numerous cases governed by the National Labor Relations Act are inapposite; whether or not conduct analogous to that here alleged has been found to be unlawful under the NLRA, the cases interpreting the Railway Labor Act have found it not to violate that statute. In Wings West, 915 F.2d at 1402, the Ninth *873 Circuit expressly notes the distinction between the two statutes on this point.
The conclusion that defendant's post-certification conduct does not violate § 2 Fourth as plaintiff contends is not governed by, but is not inconsistent with, the Supreme Court's decision interpreting that provision in Trans World Airlines, Inc. v. Independent Federation of Flight Attendants ("IFFA"), 489 U.S. 426, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989). There the Court noted that "[f]rom the time of our very first opportunity to interpret the 1934 amendments [of which § 2 Fourth is a part], we have viewed them as addressing primarily the precertification rights and freedoms of unorganized employees." Id. at 440, 109 S.Ct. at 1233-34 (emphasis added). That being the case, the implications of § 2 Fourth for post-certification conduct are limited.
In IFFA, the Supreme Court considered the standards arising under § 2 Fourth which might apply to the airline's unilateral "self-help" measures undertaken following unsuccessful bargaining which had resulted in an impasse. In that "postnegotiation" context, the Court determined that it "should hesitate to imply limitations on all but those forms of self-help that strike a fundamental blow to union or employer activity and the collective bargaining process itself." Id. at 442, 109 S.Ct. at 1235. Because the airline's conduct in the instant case occurred post-certification, but not post-negotiation, the standard enunciated in IFFA appears not to apply. Even if it does, the Court readily concludes as a matter of law that the wage freeze imposed by defendant cannot be characterized as a fundamental blow to union activity or to the collective bargaining process itself.
In Brotherhood of Locomotive Engineers v. Kansas City Southern Railway Company, 26 F.3d 787, 795 (8th Cir.1994), the Eighth Circuit has also recognized the limited application of § 2 Fourth to post-certification circumstances, holding that a cause of action lies only where the complaining party presents adequate evidence that the employer's conduct was "`motivated by anti-union animus or ... [was] an attempt to interfere with its employees' choice of their collective bargaining representative.'" Id., quoting Tello v. Soo Line R.R., 772 F.2d 458, 462 (8th Cir.1985). Because Brotherhood involved a "side agreement" which was not only post-certification by definition but which was an addendum to an existing collective bargaining agreement, it is unclear whether the standard it enunciates applies to a post-certification, pre-agreement case such as this one, governed by the Williams line of cases.
Even if the Court assumes for the sake of argument that anti-union animus would render defendant's conduct violative of § 2 Fourth, the Court would conclude that defendant is entitled to summary judgment. Defendant has come forward with evidence supporting its contentions concerning the union-neutral motivation for the wage freeze. Richard Leach, the relevant decision-maker, testified in his deposition and attested in his affidavit that the freeze was imposed for two reasons: (1) so that the airline would not "bid against itself" by raising the baseline for wages, which were sure to be a subject of negotiation with the newly-certified union; and (2) so as to avoid any potential for allegations that decisions awarding or withholding merit-based raises to particular flight attendants were based on anti-union animus. Leach Depo., pp. 12-13, 18-19; Leach Aff., ¶¶ 2-4.
In an attempt to create a dispute of fact on this issue, plaintiff relies on numerous alleged statements, oral and written, by Leach, Trudy Wight, defendant's Director of In-Flight Services, and Rita Wilhelm, defendant's In-Flight Supervisor, to the effect that wages would be frozen if the union won the election or later that wages were frozen "because of the union." Such simple factual statements are entirely consistent with Leach's unrebutted explanation of his decision to freeze wages  that because of the election of union representation, defendant would freeze wage increases during the pendency of negotiations which would address wages. The Court agrees with defendant's observation that the statements upon which plaintiff relies are so broad as to prove nothing. Even assuming that statements by Wight and Wilhelm are probative of Leach's motivation, the statements cited by plaintiff *874 are insufficient to support an inference of improper motive.
For all the foregoing reasons, the Court concludes as a matter of law that defendant's suspension of merit-based wage increases pending initial collective bargaining negotiations did not violate the Railway Labor Act. The Court will grant defendant's motion for summary judgment and deny plaintiff's motion for summary judgment. Defendant's request for oral argument will be denied. The Court here also rules on the parties' remaining discovery motions.
Accordingly,
IT IS HEREBY ORDERED that plaintiff's motion to compel and for sanctions [Docs. # 29-1 and # 29-2] and motion to compel [Doc. # 31] are denied in part as moot in view of plaintiff's partial withdrawals filed March 6 and March 12, 1996 [Docs. # 39 and # 40]. In all other respects, the motions to compel and for sanctions are denied.
IT IS FURTHER ORDERED that defendant's motion for summary judgment [Doc. # 34] is granted.
IT IS FURTHER ORDERED that plaintiff's motion for summary judgment [Doc. # 33] is denied.
IT IS FURTHER ORDERED that defendant's request for oral argument [Doc. # 35] is denied.
NOTES
[1] Although subsequent Supreme Court decisions in Detroit & Toledo Shore Line R.R. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969), and Chicago and North Western R.R. v. United Transportation Union, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971), have limited the holding of Williams to its narrow factual context, later Court of Appeals decisions have expressly noted that Williams has not been overruled and remains binding where, as here, there exists "absolutely no prior history of any collective bargaining or agreement between the parties on any matter." International Ass'n of Machinists v. Trans World Airlines, Inc., 839 F.2d 809, 814 (D.C.Cir.1988), quoting Detroit & Toledo, 396 U.S. at 158, 90 S.Ct. at 303-04.