**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,
              *Plaintiff-Appellant,*

            v.

NORTH AMERICAN AIRLINES,
              *Defendant-Appellee.*

No. 05-17436

D.C. No.
CV-05-00126-THE

OPINION

Appeal from the United States District Court
for the Northern District of California
Thelton E. Henderson, District Judge, Presiding

Argued and Submitted
November 8, 2007—San Francisco, California

Filed March 7, 2008

Before: Sidney R. Thomas, Richard C. Tallman, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

## COUNSEL

Roland P. Wilder, Jr., Baptiste & Wilder, P.C., Washington, D.C.; Duane B. Beeson, Beeson, Tayer & Bodine, for the plaintiff-appellant.

Norman A. Quandt, Ford & Harrison LLP, Atlanta Georgia; Steven R. Blackburn, Epstein Becker & Green, P.C., San Francisco, California, for the defendant-appellee.

## OPINION

IKUTA, Circuit Judge:

This appeal presents the question whether section 2, First of the Railway Labor Act (RLA), 45 U.S.C. § 152 First, read in conjunction with other provisions of the RLA, imposes a status quo requirement prohibiting carriers from unilaterally altering terms or conditions of employment once negotiations toward an initial collective bargaining agreement have begun, but before the agreement has been completed. Following the Supreme Court's holding in *Williams v. Jacksonville Terminal Co.*, we hold that it does not. 315 U.S. 386, 402-03 (1942). We also hold that the district court acted well within its discretion in denying injunctive relief in this case. *See Chicago & N. W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 583 (1971); *Reg'l Airline Pilots Ass'n v. Wings West Airlines, Inc.* (*Wings West*), 915 F.2d 1399, 1402-03 (9th Cir. 1990).

# I

North American Airlines ("North American"), a Delaware corporation, is a certified air carrier engaged in scheduled and charter passenger service, as well as service for the Department of Defense. *See* 45 U.S.C. §§ 181-182. North American employs approximately 600 employees, including 120 pilots. In January 2004, the National Mediation Board certified the International Brotherhood of Teamsters (IBT) as the collective bargaining representative for the pilots of North American. *See* 45 U.S.C. § 152 Ninth. The parties commenced negotiations for an initial collective bargaining agreement in April 2004 and negotiations continue to the present.[1]

Citing fundamental changes and turbulent times facing the airline industry, North American sent a memorandum to all employees on November 5, 2004, notifying them of its plans to cut costs and increase productivity in order to maintain operations.[2] North American announced that it would reduce costs by: instituting cost-sharing for health premiums; making changes to scheduling and compensation for flight crews, including changes to pilot scheduling; and reducing senior

---

[1]The National Mediation Board announced on September 5, 2007 that "a tentative collective bargaining agreement was reached on August 31, 2007 between North American Airlines and the International Brotherhood of Teamsters." Press Release, National Mediation Board, North American Airlines, International Brotherhood of Teamsters Reach New Tentative Agreement (Sept. 5, 2007), 2007 WLNR 17464344. By joint letter dated October 16, 2007, the parties informed the court that "the pilots rejected the tentative agreement in a ratification vote. The parties are not able to state when a new tentative collective bargaining agreement might be reached or what the specific terms of such agreement would be."

[2]North American cited a number of specific threats to its continued profitability: (1) A charter customer representing 20% of its total business declined to renew its contract expiring December 31, 2004; (2) it lost membership in a group guaranteed to receive 54% of the Department of Defense's private carrier business; (3) fuel costs had increased by 70%; and (4) competition from another airline was eroding its scheduled passenger markets in the Carribean.

management salaries, including those of the chief executive officer and chief operation officer. Regarding the pilots, North American sought to "achieve a 12-18 percent reduction in [its] flight deck costs per block hour," in other words, its costs "incurred in operating [its] aircraft as it relates to the pilots." North American could achieve these cost reductions either through scheduling changes designed to increase productivity or through wage cuts, though it considered the pilots' cooperation necessary to execute effectively any scheduling changes.

North American discussed these company-wide plans and sought input from IBT during negotiations with the pilots on November 9-11 and December 7-9, 2004, though it asserted a prerogative to institute changes unilaterally, irrespective of the pilots' approval. After the parties' negotiations in November and December 2004, North American deemed the pilots to be unwilling to provide the necessary cooperation for a successful overhaul of the schedule. It therefore made the unilateral decision to reduce its pilot costs through wage reductions. IBT applied to the National Mediation Board for mediation services on December 10, 2004, and the Board instituted mediation proceedings on December 13, 2004.

On December 28, 2004, North American issued another memorandum to its employees, updating and superceding its prior announcements with respect to its cost-reduction plan. With respect to its non-pilot employees, North American announced a 15% salary reduction for the chief executive officer and chief operation officer; a 10% reduction for other senior management and a twelve-month moratorium on merit-based salary increases; 20% sharing of healthcare premiums; flight attendant payroll reduction of 14 % through productivity increases; and a freeze of seniority-based flight attendant wage increases. With respect to the pilots, North American announced a wage reduction of 8%; a freeze of seniority-based increases to hourly wage rates; a reduction of the minimum monthly flight hour guarantee from 67 to 60 hours; and

an overtime flight hour wage rate reduction from 150% to 120%.

IBT filed this action on January 7, 2005, after the first of North American's announced changes took effect. By its complaint, IBT alleged that North American violated its obligations under section 2, First and Fourth of the RLA, 45 U.S.C. §§ 152 First and Fourth,[3] by unilaterally altering the pilots' rates of pay, rules, and working conditions after the parties had commenced negotiations regarding an initial collective bargaining agreement. IBT sought preliminary and permanent injunctive relief from any unilateral alteration to the pilots' working conditions and a return to the working conditions that existed prior to the commencement of negotiations.

After a two-day hearing (in July 2005), the district court denied the motion for preliminary injunctive relief on September 14, 2005, on the ground that IBT failed to demonstrate a likelihood of success on the merits on either of its section 2 claims. The district court ruled that section 2, First does not require the employer to maintain the status quo before the completion of an initial collective bargaining agreement. The court further held that section 2, First did not entitle IBT to an injunction to maintain the status quo.[4] The district court entered final judgment in favor of North American on November 16, 2005.

On appeal, IBT argues that North American violated its obligations under section 2, First when it unilaterally altered the rates of pay, rules and working conditions of its pilots in

---

[3]The RLA is codified at 45 U.S.C. §§ 151-188. Section 2 of the RLA is codified at 45 U.S.C. § 152; section 5 of the RLA at 45 U.S.C. § 155; section 6 of the RLA at 45 U.S.C. § 156; section 10 of the RLA at 45 U.S.C. § 160.

[4]The district court also dismissed IBT's section 2, Fourth claim. IBT does not challenge this ruling on appeal.

the midst of the parties' collective bargaining negotiations, and that IBT was entitled to an injunction to require North American to maintain the status quo.[5]

We review a district court's grant or denial of a preliminary injunction for an abuse of discretion. *Perfect 10*, *Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1157 (9th Cir. 2007). We review the district court's findings of fact for clear error, and its conclusions of law de novo. *Id.*

## II

## A

**[1]** Congress initially enacted the RLA, 45 U.S.C. §§ 151-188, in 1926 to "encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce." *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union* (*Shore Line*), 396 U.S. 142, 148 (1969). The RLA has been amended multiple times since its passage into law, including an amendment in 1936 to include coverage of air carriers, *see* 45 U.S.C. §§ 181-182, though its essential structure has not been materially altered.

The Supreme Court has provided a succinct overview of the RLA:

---

[5]North American rescinded the unilateral changes at issue in this case in October 2005, and reinstated the pilots' working conditions to those prevailing at the outset of negotiations. However, this case is not moot. We are not deprived of jurisdiction merely because the defendant voluntarily ceases the conduct at issue, unless the defendant shows that "there is no reasonable expectation that the [conduct] will be repeated," and it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *TRW, Inc. v. FTC*, 647 F.2d 942, 953 (9th Cir. 1981) (internal quotations omitted); *see also Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1274 (9th Cir. 1998). North American has not made such a showing in this case, and instead acknowledges that the case is not moot.

> The Act provides a detailed framework to facilitate the voluntary settlement of major disputes.[6] A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services sua sponte if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens 'substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President,' who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the status quo. §§ 2 Seventh, 5 First, 6, 10.

*Shore Line*, 396 U.S. at 149 n.14 (quoting *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378 (1969)).

There are four provisions in the RLA that preclude the parties from unilaterally altering the status quo while "the dispute is working its way" through the stages described above. *Id.* During the first stage, beginning when a party gives 30-day advance written notice of an intended change to an agreement, section 6 provides that if the services of the Mediation Board are either requested or proffered, "rates of pay, rules, or working conditions shall not be altered by the carrier until the con-

---

[6]"Major disputes" include disputes "over the formation of collective agreements or efforts to secure them." *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723-24 (1945).

troversy has been finally acted upon" pursuant to section 5 of the RLA. 45 U.S.C. § 156.

In the next phase, after mediation has failed and the parties have refused arbitration, section 5 imposes a thirty-day cooling off period in which "no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose." 45 U.S.C. § 155 First.

The final phase occurs only if the President decides to create an emergency board to investigate and report on a situation that threatens essential transportation service. Section 10 provides that after the creation of such a board, and for thirty days after the board makes its report to the President, "no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose." 45 U.S.C. § 160.

While the three status quo provisions described above relate to specific stages in the settlement of major disputes, section 2 of the RLA, which describes the general duties of carriers and employees, also contains a status quo provision. Section 2, Seventh precludes the parties from making unilateral changes in working conditions "embodied in agreements" except as provided in such agreements or through the process described in section 6, i.e., by providing thirty-days notice of an intended change in agreements, and proceeding through the process described above. 45 U.S.C. § 152 Seventh.

**[2]** The statutory section underlying IBT's claim in this case, section 2, First, is also part of the section imposing general duties on carriers and employers. It states:

> It shall be the duty of all carriers . . . and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes,

> whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152 First. Under this section, the responsibility to "exert every reasonable effort to make . . . agreements" commences before any agreement has been formed. *Id.* However, section 2, First does not expressly impose any obligation on the parties to maintain the status quo during this pre-agreement time frame.

## B

**[3]** As this review indicates, the RLA's "detailed framework to facilitate the voluntary settlement of major disputes," *Shore Line*, 396 U.S. at 149 n.14 (internal quotation marks omitted), focuses primarily on the period after a collective bargaining agreement is in place, when either the carrier or employees intend to make changes to the existing agreement. *Williams v. Jacksonville Terminal Co.* established a critical difference between the pre-agreement and post-agreement time frames, namely, that the RLA does not require a carrier to maintain the status quo before an initial collective bargaining agreement has been completed. 315 U.S. at 402-03.

**[4]** In *Williams*, a union argued that after the employees had selected a certified union representative and requested a conference with the railroad to negotiate an agreement, the RLA prohibited the railroad from unilaterally imposing a wage plan that would make tips earned by railroad porters a component of their wages. *See* 315 U.S. 401-02. The Supreme Court rejected this argument, stating that the "institution of negotiations for collective bargaining does not change the authority of the carrier" to alter working conditions. *Id.* at 402. The Supreme Court explained that the RLA's status quo provisions set forth in section 6 and section 2, Sev-

enth "are aimed at preventing changes in conditions previously fixed by collective bargaining agreements." *Id.* at 403; *see also id.* at 400 (holding "section 6 is phrased so as to leave no doubt that only agreements[ ] reached after collective bargaining" are covered by the status quo requirements). Further, *Williams* rejected the union's argument that section 2, First imposed a status quo requirement before a collective bargaining agreement was formed:

> Because the carrier was, by the [RLA], placed under the duty to exert every effort to make collective agreements, it does not follow that pending those negotiations, where no collective bargaining agreements are or have been in effect, the carrier cannot exercise its authority to arrange its business relations with its employees in the manner shown in this record.

*Id.* at 402. In sum, *Williams* leaves no doubt that the RLA does not require the parties to maintain the status quo during the time frame before a collective bargaining agreement has been completed, regardless of whether negotiations have been instituted.

The Supreme Court addressed a different issue in *Shore Line*, namely, the scope of the status quo provisions of the RLA during the time frame after a collective bargaining agreement had been completed. 396 U.S. at 143. In *Shore Line*, a railroad notified a union with which it already had an existing collective bargaining agreement that it planned to require certain employees to report to work in new locations. *Id.* at 143-46. The parties had not addressed the work location issue in the existing agreement, and the union proposed an amendment to cover the changed working conditions. *Id.* While the parties' dispute was pending before the National Mediation Board, the railroad attempted to impose its intended changes unilaterally. *Id.* at 146. The railroad argued that the status quo provision of section 6 precluded changes

only to those conditions already set forth in an agreement and that it was therefore free to change any working conditions that were not expressly embodied in the existing collective bargaining agreement. *Id.* at 147-48.

The Court disagreed. The Court reasoned that "[i]t would be virtually impossible to include all working conditions in a collective-bargaining agreement," and when a union moves to amend an agreement to address a disputed working condition, it would defeat the purpose of the RLA to allow the carrier to make a change unilaterally to the very working condition under dispute. *Id.* at 154-55. Reading section 6 "in conjunction with the implicit status quo requirement in the obligation imposed upon both parties by § 2 First, 'to exert every reasonable effort' to settle disputes without interruption to interstate commerce," *id.* at 151 (quoting 45 U.S.C. § 152 First), the Court concluded that section 6's prohibition on changing the status quo extended to all working conditions that comprised the status quo, not just those working conditions already embodied in the collective bargaining agreement. *Id.* at 151-53.

In reaching this conclusion, the Court rejected the railroad's argument that such an interpretation of section 6 would conflict with *Williams*. The Court noted that *Williams* did not address the question raised in *Shore Line*, i.e., whether after a collective bargaining agreement had been completed, section 6's status quo provision applied to all working conditions or just the working conditions documented in the existing collective bargaining agreement. *Id.* at 157-58. Rather, *Williams* considered the period before a collective bargaining agreement had been completed, and considered whether the RLA's status quo provisions were even applicable in that time frame. *Id.* at 158. As the Court summed it up,

> it is readily apparent that *Williams* involved only the question of whether the status quo requirement of § 6 applied at all. The Court in *Williams* therefore

> never reached the question of the scope of the status quo requirement in a dispute, such as the one before the Court today, to which that requirement concededly applies.

*Id.* Accordingly, the Court concluded, *Williams*'s statement that the status quo provisions of section 6 apply only where there is a "change in agreements," *Williams*, 315 U.S. at 400, merely clarified the time frame in which section 6 applies. *Williams* did not conflict with *Shore Line*'s holding that once the status quo provisions are applicable, they apply to all working conditions, not just those embodied in agreements. *Shore Line*, 396 U.S. at 158.

## C

In this case, no collective bargaining agreement has been completed. Under *Williams*, neither the RLA in general, nor section 2, First in particular, imposes a status quo requirement on the employer during this pre-agreement time frame, regardless whether negotiations have been instituted. Nevertheless, IBT raises a number of arguments as to why section 2, First, read together with other provisions of the RLA, precludes North American from making any changes in the status quo once negotiations have commenced.

IBT begins by noting that the status quo provisions in the RLA are not limited to the post-agreement time frame by their terms. For example, the plain language of section 6 provides that the employer may not alter the status quo "[i]n every case" where "the services of the Mediation Board have been requested by either party, or said Board has proffered its services." 45 U.S.C. § 156. Similarly, IBT argues that neither section 5, First (providing that if mediation fails, the parties will maintain the status quo for 30 days after notice of the failure) nor section 10 (providing that after the emergency board makes its report to the President, the parties will maintain the status quo for 30 days) expressly limit their respective

status quo requirement to the period after a collective bargaining agreement has been completed. Accordingly, IBT argues, these status quo provisions could take effect before any agreement had been completed between the parties. IBT further notes the statement in *Shore Line* that section 2, First, in conjunction with sections 5, 6 and 10, form "an integrated, harmonious scheme for preserving the status quo from the beginning of the major dispute through the final 30-day 'cooling-off' period." 396 U.S. at 152. Because the RLA does not expressly limit the applicability of the status quo requirements to the post-agreement time frame, and in light of *Shore Line*'s vision of a comprehensive scheme for preserving the status quo, IBT argues that we must read the RLA as precluding unilateral changes in working conditions even before any agreement has been completed.[7]

The obvious problem with this interpretation is that, as noted above, *Williams* expressly held that section 2, First, read in context with the other provisions of the RLA, does not impose a status quo requirement upon the carrier prior to the formation of a collective bargaining agreement, regardless of whether negotiations have commenced. 315 U.S. at 402-03. In response, IBT argues that *Williams* was limited by *Shore Line*, when it stated that, "[i]n *Williams* there was absolutely no prior history of any collective bargaining or agreement between the parties on any matter." 396 U.S. at 158. According to IBT, this statement implicitly creates the converse rule: Where there is any prior history of collective bargaining, the

---

[7]IBT did not assert a claim under section 6 of the RLA, nor does it argue on appeal that section 6 creates an entitlement to a status quo injunction prior to the formation of an initial collective bargaining agreement. Such a claim would be foreclosed by *Williams*, 315 U.S. at 400; *see also Wings West*, 915 F.2d at 1402. Our sister circuits have reached the same conclusion. *See, e.g.*, *Atlas Air, Inc. v. Air Line Pilots Ass'n*, 232 F.3d 218, 223 (D.C. Cir. 2000) (collecting cases); *Aircraft Mechs. Fraternal Ass'n v. Atl. Coast Airlines, Inc.*, 55 F.3d 90, 93 (2d Cir. 1995); *Int'l Ass'n of Machinists and Aerospace Workers v. Transportes Aereos Mercantiles Pan Americandos, S.A.*, 924 F.2d 1005, 1008 (11th Cir. 1991) (*TAMPA*).

status quo provisions of RLA must apply. The Eleventh Circuit has adopted this reasoning, stating that *Shore Line* "limited *Williams*' allowance of unilateral changes to the narrow situation where there is 'absolutely no prior history of any collective bargaining *or* agreement between the parties on any matter.' " *TAMPA*, 924 F.2d at 1008 (quoting *Shore Line*, 396 U.S. at 158) (emphasis added in *TAMPA*). Moreover, IBT points to our decision in *Wings West*, where we rejected a union's request under section 2, First for an injunction precluding an employer from unilaterally changing working conditions, and noted that "there ha[d] been no negotiation process instituted at all" between the employer and employees. *Wings West*, 915 F.2d at 1403. Again, IBT argues that this language implicitly creates an entitlement to an injunction once negotiations have commenced. In other words, IBT asks us to follow the Eleventh Circuit's reasoning in *TAMPA*, and hold that *Williams* is no bar to reading section 2, First as precluding carriers from changing the status quo once negotiations have commenced.

We must decline this invitation, because in our view *Williams* has not been limited by *Shore Line*, and the cited language in *Wings West* is not on point. As noted above, *Shore Line* and *Williams* addressed the applicability of the RLA during different time frames, and *Shore Line* was careful to distinguish *Williams* rather than overrule it. *Shore Line* did not even address the applicability of a status quo provision in the period before a collective bargaining agreement had been completed, and so it in no way modified *Williams*'s ruling that a carrier can "exercise its authority to arrange its business relations with its employees" during the time frame before an initial collective bargaining agreement has been completed. *Williams*, 315 U.S. at 402. Nor can *Shore Line*'s description of the facts in *Williams*, i.e., that "there was absolutely no prior history of any collective bargaining or agreement between the parties on any matter," *Shore Line*, 396 U.S. at 158, be read as implicitly overruling *Williams*'s holding, particularly because *Shore Line* explicitly declined to overrule

*Williams*. *See id.* (declining to "comment upon the current vitality" of *Williams'*s rejection of the unions' claims).

Moreover, our statement in *Wings West* that "there ha[d] been no negotiation process instituted at all," 915 F.2d at 1403, related only to our conclusion that the plaintiff had failed to satisfy "the prerequisites for stating a claim under the authority of *Chicago & N. W. Ry.*," *id.* at 1403. In other words, we held, in light of the facts in *Wings West*, it would have been premature to hold that an injunction was "the only practical, effective means of enforcing the duty to exert every reasonable effort to make and maintain agreements," *Chicago & N. W. Ry. Co.*, 402 U.S. at 583. IBT's attempt to establish the converse of the rule established in *Williams* is unsupported by either *Shore Line* or *Wings West*.

IBT also raises several policy arguments to support its position. First, IBT argues that we should interpret section 2, First by analogy to the National Labor Relations Act (NLRA). Because an employer's unilateral change of working conditions during the bargaining process would violate the employer's duty to bargain in good faith under the NLRA, *see NLRB v. Katz*, 369 U.S. 736, 743 (1962), such actions should also be deemed a violation of the employer's analogous obligation under section 2, First. We rejected a similar interpretation in *Wings West*, 915 F.2d at 1402. We observed that the NLRA provides for an administrative agency, the National Labor Relations Board, to issue judicially-enforceable orders, whereas the RLA creates no such agency, *id.*, and noted that it was therefore "doubtful that Congress intended the federal courts to operate [under the RLA] as the NLRB does under the . . . NLRA." *Id.* Therefore, we declined to read section 2, First as incorporating a standard for granting an injunction analogous to the standard under the NLRA for enforcing an employer's duty to bargain in good faith. *Id.*

**[5]** Finally, IBT notes that if the status quo provisions of the RLA are inapplicable before a collective bargaining agree-

ment has been formed, a carrier would have no obligation to maintain the status quo during the pre-agreement time frame even if the President had formed an emergency board to investigate a pending strike. Whatever the merits of this policy argument, it does not overcome *Williams*'s conclusion that the status quo provisions of the RLA do not bind the parties prior to the formation of an initial collective bargaining agreement. Therefore, we agree with the Second Circuit's conclusion in *Aircraft Mechanics Fraternal Ass'n* that "the essential holding of *Williams* remains good law," 55 F.3d at 94, and we hold that the RLA does not preclude parties from unilaterally changing working conditions before a collective bargaining agreement has been formed, even if negotiations have commenced.

### III

Because we hold that section 2, First does not prohibit carriers from altering working conditions in the period before a collective bargaining agreement has been completed, we also reject IBT's argument that it is entitled to injunctive relief requiring North American to comply with a status quo requirement imposed by section 2, First.[8] The district court found that "the parties continue to negotiate, with no evidence that either side is not participating in good faith with the desire to reach agreement and no indication that the mediation will not ultimately be successful." These findings were not clearly erroneous. *See Perfect 10*, 508 F.3d at 1157.

---

[8]IBT bases its claim of entitlement to injunctive relief solely on the theory we have rejected, namely, that North American violated a status quo obligation imposed by section 2, First. IBT does not argue that North American violated section 2, First's requirement that it "exert every reasonable effort to make and maintain agreements" in some other way, such as by "engag[ing] in the mere pretense of negotiation" or "adopt[ing] evasive and dilatory tactics." *Ass'n of Flight Attendants, AFL-CIO v. Horizon Air Indus., Inc.*, 976 F.2d 541, 545 (9th Cir. 1992) (internal quotation marks omitted). Therefore, we do not address such alternative theories for obtaining injunctive relief before the completion of an initial collective bargaining agreement.

**[6]** Because IBT has not established that an injunction "is the only practical, effective means of enforcing the duty to exert every reasonable effort to make and maintain agreements," IBT does not meet the standard for injunctive relief. *See Chicago & N. W. Ry. Co.*, 402 U.S. at 583. Accordingly, the district court acted well within its discretion in denying IBT's motion for a preliminary injunction.

**AFFIRMED.**