**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINES DIVISION; AIRLINE PROFESSIONALS ASSOCIATION OF THE IBT, LOCAL UNION NO. 1224, *Plaintiffs-Appellees*, | No. 14-16465 <br><br> D.C. No. 2:14-cv-00043-APG-GWF |
| v. | OPINION |
| ALLEGIANT AIR, LLC; ALLEGIANT TRAVEL COMPANY, *Defendants-Appellants*. | |

Appeal from the United States District Court
for the District of Nevada
Andrew P. Gordon, District Judge, Presiding

Argued and Submitted
February 2, 2015—San Francisco, California

Filed June 8, 2015

Before: Richard C. Tallman and Johnnie B. Rawlinson, Circuit Judges, and Stephen Joseph Murphy, III, District Judge.[*]

Opinion by Judge Murphy

---

[*] The Honorable Stephen Joseph Murphy, III, District Judge for the U.S. District Court for the Eastern District of Michigan, sitting by designation.

**SUMMARY**[**]

**Labor Law**

The panel vacated the district court's preliminary injunction in a union's action against an airline under the Railway Labor Act.

The district court preliminarily enjoined the airline from making policy changes to pilot work rules during the negotiation of a new contract between the union and the airline following the National Mediation Board's certification of the union as the pilots' representative.

The panel held that the district court had jurisdiction because the case did not raise a representation dispute, and there was no jurisdictional bar preventing the court, rather than the Board, from determining whether a previous advocacy group was a representative within the meaning of the RLA. The panel concluded that it was not reviewing the Board's finding that the pilots were previously unrepresented. In addition, the airline had waived the argument that the Board's finding was entitled to preclusive effect.

The panel concluded that the Allegiant Air Pilots Advocacy Group, which had negotiated and agreed to the work rules prior to the union's certification as the pilots' representative, was not an RLA representative because it sought neither Board certification nor voluntary recognition. Accordingly, the pilot work rules were not a collective

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

bargaining agreement under the RLA. The panel held that the district court erred in entering an injunction because the RLA does not require an airline to maintain the status quo during negotiations of an initial labor agreement.

## COUNSEL

Douglas W. Hall, Ford Harrison LLP, Washington D.C., for Defendants-Appellants.

Edward M. Gleason Jr., Law Office of Edward Gleason, PLLC, Washington, D.C.; Michael A. Urban and Nathan R. Ring (argued), The Urban Law Firm, Las Vegas, Nevada; James Petroff, Barkan Meizlish LLP, Columbus, Ohio, for Plaintiffs-Appellees.

## OPINION

MURPHY, District Judge:

### I. INTRODUCTION

Allegiant Air is an airline operating from Las Vegas, Nevada. In 2004, Allegiant's employees organized a pilot advocacy group (the Allegiant Air Pilots Advocacy Group, or "AAPAG") and elected representatives to bargain with the airline on their behalf. Over the next few years, AAPAG and Allegiant negotiated and agreed to several different Pilot Work Rules, detailed documents that outlined Allegiant's policies and work conditions. In 2012, some pilots decided they wanted to unionize. The Teamsters expressed interest in representing the pilots and petitioned the National Mediation

Board (the Board) to certify them as the pilots' bargaining representative under the Railway Labor Act (RLA). The Board conducted a secret ballot of the pilots and then certified the Teamsters as the pilots' RLA representative. Shortly thereafter, Allegiant changed several policies contained in the Work Rules without consulting the Teamsters.

The Teamsters brought suit. They sought a preliminary injunction that would prevent Allegiant from making any policy changes to the Pilot Work Rules while they negotiated a new contract. The Teamsters contend the AAPAG, its predecessor negotiating on behalf of the pilots, was a representative under the RLA. They argue that the Pilot Work Rules were a collective bargaining agreement. And they assert here that the district court properly enjoined Allegiant from altering the agreement until the parties complete the RLA mandated mediation process.

Allegiant disagrees. It contends the district court did not have jurisdiction to determine whether AAPAG was an RLA representative when it executed the Work Rules. It argues that even if the district court did have jurisdiction, AAPAG was not an RLA representative, but merely an informal employee advocacy group. It contends that the Work Rules are not a collective bargaining agreement, the policy modifications are at most differing interpretations of those Work Rules, and an injunction is inappropriate because the Teamsters have not demonstrated irreparable harm.

The district court found that it had jurisdiction over the dispute. It determined the AAPAG was an RLA representative, reasoning that the employees had elected AAPAG for the purpose of negotiating terms of employment with the carrier. It therefore enjoined Allegiant from making

several  policy changes until the parties had completed RLA mandated mediation. And it ordered the parties to create a Board of Adjustment to arbitrate the remaining issues.

We have jurisdiction under 28 U.S.C. § 1292(a)(1). We conclude that AAPAG was not an RLA representative. We therefore vacate the injunction and remand the case.

## II. BACKGROUND

In 2004, Allegiant grew tired of having "50-odd pilots constantly trumping through the office" with individual complaints. To solve the problem, management approached several senior pilots and asked them to form an organization that could channel employee grievances and provide pilot input. The senior pilots talked with their colleagues and a short while later thirty-five pilots met at PT's Pub in Las Vegas to create AAPAG.

Over the next few years, Allegiant grew rapidly, doubling the number of pilots and expanding its flights to new destinations. AAPAG grew with the company. The pilots annually elected officers who helped interview applicants, advocated for employees during grievance disputes, and discussed pay and work conditions with Allegiant's management.

AAPAG's stated mission was to communicate pilot concerns to management, and it described itself as a "consulting agency on issues relating to the pilot group." For several years, pilots and management enjoyed a good relationship. Allegiant allowed AAPAG to give Power Point presentations to new hires. When pilots had pay or leave problems, AAPAG officers advocated on the pilots' behalf,

and Allegiant always resolved the issue in a way that "was satisfactory for all involved."

AAPAG and Allegiant also negotiated Pilot Work Rules, documents articulating company policies on leave, pay, scheduling, and other issues that mattered to the parties. For example, AAPAG negotiators and management agreed that the pilots would get an additional five dollars per hour in exchange for less guaranteed flight time. Before implementing the policy change, AAPAG conducted a secret ballot of the pilots, who "overwhelmingly approved" the change. During that period, Allegiant adhered to the Work Rules; when a question arose about the meaning or application of the Work Rules, Allegiant and AAPAG worked together to find a solution, and Allegiant typically made the aggrieved party whole.

The parties negotiated the most recent Work Rules in 2010.[1] The forty-nine page document was signed by both AAPAG's President and Allegiant's Vice President of Flight Operations. In the introduction, it states that "[t]he Flight Operations Department of Allegiant Air will develop, refine, and clarify changes to the Pilot Work Rules, Benefits and Compensation in coordination with the Allegiant Air Pilot's Advocacy Group (AAPAG), the elected and representative body of the pilot group of Allegiant Air." It also states Allegiant would "meet with AAPAG to consider revisions and updates to the Work Rules" and that they would "coordinate with AAPAG" to resolve questions about the Work Rules application. Bold lettering at the bottom of the page reads: "Nothing contained in these Work Rules should

---

[1] One witness testified that the final Work Rules were actually implemented in 2011, and that the 2010 date on the document is an error.

be interpreted as giving rise to a contract or a promise of employment for any period of time."

In 2012, many pilots wanted to unionize with the Teamsters. AAPAG's officers agreed and campaigned on the Teamsters' behalf. Some AAPAG officers joined the Teamsters' Organizing Committee. AAPAG's president provided the pilots with a brochure stating they were operating "without a current contract," that the pilots needed more than "a legal version of our 40 page work rules," and outlined the benefits of Teamsters representation. During the unionization campaign, AAPAG took the position that the pilots did not have a legally binding contract with the company. And when the Teamsters petitioned the Board to certify it as the pilots' RLA representative, it listed the pilots as presently unrepresented. None of AAPAG's officers serving on the Teamsters' Organizing Committee contested that categorization.

The Board held an election among the pilots, who voted to unionize with the Teamsters. The Board then certified the Teamsters as the pilots' RLA bargaining representative. Two weeks after the certification, the Teamsters notified Allegiant that it intended to negotiate a new collective bargaining agreement. The notice stated that the Teamsters expected Allegiant not to unilaterally change any of the conditions in the Work Rules while they negotiated a new contract. Shortly thereafter, Allegiant changed its policies regarding pilots who lose their medical certificate due to being sick or hurt, eliminated pay protection for employees engaged in collective bargaining, altered how many days new parents could take off to spend with their children, and created a new scheduling system. The Teamsters then filed suit, seeking to

enjoin the changes while the parties negotiated a collective bargaining agreement.

## III. OVERVIEW OF RAILWAY LABOR ACT

Congress passed the RLA to expediently help railroads and their employees resolve conflicts, before disagreements turned into strikes that would paralyze interstate commerce. *See Int'l Bhd. of Teamsters v. N. Am. Airlines*, 518 F.3d 1052, 1055–56 (9th Cir. 2008). In 1936, Congress amended the RLA to include coverage of air carriers, 45 U.S.C. § 181, but otherwise, the same structure of the Act remained.

Under the Act, employees may designate a representative to negotiate agreements concerning rates of pay, rules, and working conditions. When a conflict arises "among a carrier's employees as to who are the representatives of such employees," the Board has the sole power to determine when a group or person is a valid representative. *Id.* § 152, Ninth. The Board is authorized "to take a secret ballot of the employees," and may take steps to "insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier." *Id.* After the Board determines the employees' preferred representative, the Board certifies the representative, and "the carrier shall treat with the representative so certified." *Id.*

Judicial review of representation disputes is extremely circumscribed. Federal courts may not review the Board's certification decision or independently determine whether a group represents employees. *Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297, 300 (1943). Furthermore, the Board's "decisions regarding its methods of investigation, balloting procedures, and findings regarding employer

interference, influence, or coercion, have been largely unreviewable." *Horizon Air Indus. Inc. v. Nat'l Mediation Bd.*, 232 F.3d 1126, 1132 (9th Cir. 2000). Courts have limited jurisdiction to ensure the Board acts constitutionally and within the scope of its statutory authority. *Id.* Board factual findings have preclusive effect under traditional principles of estoppel. *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991).

Once a representative and a carrier have reached an agreement concerning rates of pay, rules, and working conditions, the Act prescribes specific steps parties must take to change the agreement. A party that wants to change an agreement must give advance written notice. 45 U.S.C. § 156. Parties are required to meet in a good faith attempt to voluntarily settle any disagreement. *Id.* § 152, Second. If conferring fails, either party may request the services of the Board to mediate a dispute. *Id.* § 155, First. And, if the mediation fails, the parties may consent to binding arbitration. *Id.* § 157. Finally, if mediation fails and the parties reject arbitration, the RLA imposes a thirty-day cooling off period. *Id.* § 155, First. Only then can a carrier change an agreement and a labor organization lead its employees out on strike. During the period of negotiation, neither party may unilaterally change employee working conditions. *Id.* § 156; *see generally Int'l Bhd. of Teamsters*, 518 F.3d at 1056 (citing *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 149 n.14 (1969)).

A different process exists when parties contest the meaning or proper application of a particular provision of an agreement. In that case, the RLA requires employees and carriers first to exhaust the grievance procedure specified in a collective bargaining agreement. 45 U.S.C. § 184. Next, a

representative for an employee and a carrier must meet in conference to try to settle the dispute. *Id.* § 152, Second. If parties are unable to resolve a disagreement, the dispute is subject to binding arbitration before a board of adjustment established by the involved airline and labor representative. *Id.* § 184; *see Consol. Rail Corp. v. Ry. Labor Exec. Ass'n*, 491 U.S. 299, 304 n.4 (1989).

## IV. JURISDICTION OF DISTRICT COURT

We review de novo whether the district court had jurisdiction. *Horizon Air*, 232 F.3d at 1128, 1131. District courts have the power to enjoin a carrier from changing a bargaining agreement while the parties complete the process mandated by the RLA. *Consol. Rail*, 491 U.S. at 303. Allegiant argues the district court lacked jurisdiction because the case turns in part on whether AAPAG was an RLA representative when it agreed to the Work Rules. According to Allegiant, only the Board has the power to determine whether a group is (or was) a representative under the Act. We hold that while the Board has sole power to determine labor's current bargaining agent, there is no jurisdictional bar preventing a district court from finding that a previous advocacy group was a representative within the meaning of the RLA.

Allegiant also argues that during the Board's investigation, it found the pilots were previously unrepresented. Because the Board made that finding during the course of its investigation, Allegiant contends the Board's factual conclusion is unreviewable. We hold that when a party is challenging *an action* taken by the Board—like its certification of a labor representative or its efforts to prevent employer interference with an election—district court review

is limited to ensuring that the Board acted constitutionally and within the scope of its statutory authority. But when a party brings a claim that does not challenge an action taken by the Board, the district court has jurisdiction, even if the claim denies the Board's legal or factual conclusion. And the district court should then review the Board's findings under principles of estoppel.

## A. *Representation Dispute*

The most important purpose of the RLA was "the avoidance of industrial strife, by conference between the authorized representatives of employer and employee." *Bhd. of Ry. & S.S. Clerks v. Nat'l Mediation Bd.*, 380 U.S. 650, 658 (1965). An "explosive problem" in its application is how to determine what labor organization represented employees. *Switchmen's Union*, 320 U.S. at 303. "[W]hether one organization or another was the proper representative of a particular group of employees was one of the most controversial questions in connection with labor organization matters." *Id.* at 302 (internal quotation marks omitted).

Section 152, Ninth, establishes "the machinery for the selection of the representatives of employees." *Bhd. of Ry. & S.S. Clerks*, 380 U.S. at 658. It provides for a "neutral tribunal" that can expediently determine employees' bargaining representative and "get the matter settled." *Switchmen's Union*, 320 U.S. at 303. That section provides in relevant part:

> If any dispute shall arise among a carrier's employees as to who are the representatives of such employees . . . it shall be the duty of the Mediation Board, upon request of either party

> to the dispute, to investigate such dispute and to certify to both parties . . . the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. . . . In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier.

45 U.S.C. § 152, Ninth. It further states that once the Board has investigated the dispute and certified a representative, "the carrier shall treat with the representative so certified." *Id.*

The Supreme Court has held that the Board has the sole power to certify a group or person as an employee representative. *Switchmen's Union*, 320 U.S. at 300 (holding federal courts do not have jurisdiction to review the Board's certification decision). Courts also lack jurisdiction to provide relief that is the functional equivalent of an RLA certification like, for instance, entering a declaratory judgment determining what group can bargain on the employees' behalf. *Gen. Comm. of Adjustment v. Mo.-Kan.-Tex. R. Co.*, 320 U.S. 323, 327 (1943) (holding that the district court lacked jurisdiction to find "that the Engineers should be declared to be the sole representative of the locomotive engineers with the exclusive right to bargain for them").

Furthermore, courts decline to exercise jurisdiction when parties bring an otherwise justiciable claim that requires the court to examine whether a class of employees are represented, and if so, by whom. *See United Transp. Union v. Gateway W. Ry. Co.*, 78 F.3d 1208, 1216 (7th Cir. 1996) (holding court lacked jurisdiction to determine if parent company's union also represented subsidiary's employees).

Cases on which Allegiant relies similarly either require a court to determine the employees' current representative or to compel a carrier to bargain in the face of competing representation claims. *See Int'l Bhd. of Teamsters v. Tex. Int'l Airlines*, 717 F.2d 157, 161 (5th Cir. 1983) (declining jurisdiction to enforce a bargaining agreement that would "inescapably entail[] the continuance of the Union's role as employee representative"); *United Transp. Union v. United States*, 987 F.2d 784, 790 (D.C. Cir. 1993) (declining to determine which of two unions was the employees' bargaining representative).

Neither party cites any case in which the court determined the status of a past advocate rather than adjudicated a present dispute about what party represents labor. Our research has not revealed any such case. Resolving the issue as one of first impression, we find the district court correctly exercised jurisdiction. At the outset, we reiterate that federal courts have jurisdiction to enjoin changes to the status quo while parties complete mediation. The only issue is whether Section 152, Ninth, precludes that determination here.

For several reasons, we do not think Section 152, Ninth, is applicable. That section gives the Board jurisdiction when "any dispute shall arise among a carrier's employees as to who are the representatives of such employees." 45 U.S.C.

§ 152, Ninth. Simply put, there is no dispute among the employees that the Teamsters are the pilots' current bargaining representative. Indeed, the Board has already certified the Teamsters as the bargaining representative and no party challenges that certification. AAPAG's position at the time it negotiated the Work Rules has no bearing on the Teamsters' current status.

Furthermore, Section 152, Ninth, provides that once the Board determines the bargaining representative, it must issue a certification, and the carrier must "treat with the representative so certified." We are not issuing AAPAG a certificate or its equivalent. And there is no reason for the Board to issue a certificate to AAPAG on the basis of its past advocacy. Our resolution of AAPAG's status when it negotiated the Work Rules will not require the carrier to treat with AAPAG now, or ever. In short, no competing unions vie for the right to bargain, and no employees seek to remain or become unaffiliated. All agree the Teamsters are the employees' RLA representative, entitled to bargain with Allegiant. Accordingly, this case does not raise a representation dispute, and federal courts have jurisdiction to resolve it.

B. *The Board's Factual Finding*

In 2012, the Teamsters petitioned the Board, seeking a certification that it was the pilots' bargaining representative. During the Board's investigation, it determined that no party represented the pilots. The effect of the finding was that when the pilots voted, they had the option of voting for the Teamsters, of writing in other candidates, or to remain unrepresented. *See* National Mediation Board, Representation

Manual § 13.201.[2] If the Board had found that AAPAG represented the pilots, the ballot also would have included the option of voting for AAPAG, but that was not the case. Allegiant contends we do not have jurisdiction to review the Board's finding that the pilots were unrepresented.

Different rules apply when we directly review a Board action and when an independent claim raises issues the Board has already addressed. In the former situation, judicial review is limited to ensuring the Board acted constitutionally and within the scope of its statutory authority. *Horizon Air Indus.*, 232 F.3d at 1132. For example, if AAPAG had challenged the Board's certification of the Teamsters on the grounds that the Board had wrongfully kept AAPAG off the ballot, then our review would be limited to taking a "peek at the merits" to ensure that AAPAG's exclusion was constitutional and the Board did not exceed its statutory authority. *Id.*

But in the latter case, when a party brings a claim that does not challenge a Board action but nonetheless raises an issue the Board has already addressed, courts apply principles of estoppel. Courts "have long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991). "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." *Id.* (quoting *United States v. Utah Constr. &*

---

[2] The representation manual is available on the Board's website, http://www.nmb.gov/documents/representation/representation-manual.pdf.

*Mining Co.*, 384 U.S. 394, 422 (1966)). We have previously found that Board determinations have preclusive effect when made in proceedings that satisfy due process and when the findings were supported by substantial evidence. *Bldg. Material & Constr. Teamsters Local No. 216 v. Granite Rock Co.*, 851 F.2d 1190, 1195 (9th Cir. 1988).

In the present case, we are not reviewing any administrative action. No party has asked us to invalidate the Board's certification of the Teamsters as the pilots' representative. Rather, the case presents claims independent of the Board's certification and involve the legality of Allegiant's changes to the Work Rules. And resolving whether Allegiant's policy changes were legal turns in part on whether AAPAG was the pilots' previous RLA representative—a factual determination the Board has already answered in the negative. The question, then, is whether the Board's finding is entitled to preclusive effect.

Allegiant did not argue in its opening brief that the Board's determination should have preclusive effect. Rather, Allegiant framed its argument as being solely about jurisdiction. In its answering brief, the Teamsters asserted that principles of collateral estoppel should not prevent the Court from revisiting AAPAG's representation status. And, in its Reply, Allegiant acknowledges that it did not raise the argument of collateral estoppel, but states "IBT's contention that collateral estoppel would not apply . . . has no merit." Allegiant cites no authority applying preclusion principles in any analogous situation and, other than the quoted conclusory statement, it does not address the issue of estoppel. We have discretion to consider an issue raised in a reply brief where, as here, an appellee raised an issue in its brief. *United States v. Bohn*, 956 F.2d 208, 209 (9th Cir. 1992) (per curiam). But

because Allegiant's Reply does not cite relevant authority or otherwise press the point, we find the argument waived.**[3]**

For these reasons, we hold that the district court properly asserted jurisdiction over the parties' dispute.

## V. AAPAG'S REPRESENTATIVE STATUS

The district court enjoined Allegiant from changing the Work Rules. And the injunction turned in part on whether AAPAG was an RLA representative. We review a district court's injunction for abuse of discretion. *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 994 (9th Cir. 2011). The threshold question of whether AAPAG was an RLA representative is a question of law that we review de novo. *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881 (9th Cir. 2012). "When a district court makes an error of law, it is an abuse of discretion." *Id.*

The RLA defines "representative" as "any person or persons, labor union, organization, or corporation designated either by a carrier or group of carriers or by its or their employees, to act for it or them." 45 U.S.C. § 151, Sixth. We

---

[3] The Board required the Teamsters to identify whether there was an incumbent representative at the time it requested that the Board investigate the representation dispute. *See* National Mediation Board, Representation Manual, § 1.02(3). At that time, the Teamsters took the position that AAPAG was not an RLA representative. The position was to their advantage because it kept AAPAG off the election ballot. In a footnote in its Reply, Allegiant argues for the first time that the doctrine of judicial estoppel prevents the Teamsters from taking inconsistent positions. Reply Brief n.4, (citing *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996)). Because Allegiant raises that argument for the first time in its Reply, we find the argument also waived.

hold that employees can "designate" an RLA representative in two ways. Employees may petition the Board to certify a labor representative. *Id.* § 152, Ninth. Or, a labor organization can seek voluntary recognition, which requires a) it to unequivocally demand RLA recognition from the carrier, b) for the carrier to unequivocally grant recognition, and c) for the labor organization to make a contemporaneous showing that it enjoys majority support amongst the relevant workforce. *See N.L.R.B. v. Triple C Maint., Inc.*, 219 F.3d 1147, 1153 (10th Cir. 2000) (describing voluntary recognition under the National Labor Relations Act). Because AAPAG sought neither Board certification nor voluntary recognition, we find it was not an RLA representative.

## A. *The Need For Certainty*

Employees, employers, and federal courts need certainty—prior to the advent of litigation—on whether an advocacy group is an RLA representative. For example, a court's ability to enjoin a labor strike could turn on whether employees have designated a representative. Hypothetically, if AAPAG was not an RLA representative then the Norris-LaGuardia Act might prevent a court from enjoining an AAPAG-led strike. *See Aircraft Serv. Int'l, Inc. v. Int'l Bhd. of Teamsters*, 779 F.3d 1069, 1080–81 (9th Cir. 2015) (en banc) (Berzon, J., concurring). If, however, AAPAG was a representative, then the pilots would need to use the RLA dispute resolution mechanisms prior to engaging in economic coercion. *See Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R.*, 353 U.S. 30, 42 (1957) (finding courts can enjoin union strike while parties undergo mandatory arbitration). Resolution of the dispute would turn on whether AAPAG was the current bargaining representative, and that question is

within the sole jurisdiction of the Board. *See supra* Section IV.A.

In a similar hypothetical, if an employee had filed suit disputing Allegiant's application of the Work Rules, the law and forum would turn on whether AAPAG was an RLA representative. If AAPAG was not a representative, and the Work Rules were therefore not a collective bargaining agreement, the employee's remedy, if any, would be under state contract law. *See Sw. Gas Corp. v. Vargas*, 111 Nev. 1064, 1072 (1995) (explaining that employee handbooks can create an employment contract, even if the handbook includes a disclaimer). But if AAPAG was an RLA representative, the employee would have to use the Act's arbitration procedures. 45 U.S.C. § 184. The forum, the law, and the remedy all turn on the status of the labor advocate, a status courts typically do not have jurisdiction to determine.

Furthermore, many airlines establish employee advocacy groups as a way to facilitate employee input. The Board has repeatedly stated that employee committees are lawful under the RLA, unless the carrier uses the group to interfere with a Board election. *Delta Airlines*, 30 N.M.B. 102, 122 (2002); *Am. Airlines*, 26 N.M.B. 412, 453 (1999). Carriers often pay the advocacy group leaders for time spent advocating, as well as help set up elections, fund group programs, and provide management classes for group officers. *See, e.g.*, *Delta Airlines*, 30 N.M.B. at 122–26. While carriers are free to organize channels of communication between pilots and management, those actions become illegal if the advocacy group unwittingly changes into an RLA representative. 45 U.S.C. § 152, Fourth. Those potentially negative legal consequences require employees to put the carrier on notice of a group's representative status.

Being an RLA representative also imposes legal obligations on the labor organization. Aside from the explicit obligations the Act lays out in Section 152, RLA representatives also have a duty of fair representation, *Landers v. Nat'l R.R. Passengers Corp.*, 485 U.S. 652, 658 (1988) (citing *Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192, 204 (1944)). And representatives have a statutory duty to file reports with the Department of Labor, 29 U.S.C. §§ 402(j)(2), 431.

It is important that employees act purposefully when choosing an RLA representative. When employees designate a representative, it affects the applicability of the RLA and the authority of federal courts to interfere on behalf of both employees and employers. The choice also imposes duties on both parties. This need for clarity compels us to hold that an entity becomes an RLA representative only when certified by the Board or voluntarily recognized by the employer.

B.  *Designating A Representative*

The simplest way for employees to designate an RLA representative is to petition the Board to certify a labor representative. The carrier then "shall treat with the representative so certified." 45 U.S.C. § 152, Ninth. Unless a labor representative "formally seeks and obtains certification as the employees' chosen representative, the employer's duty to 'treat' with, i.e. recognize, the representative, is not triggered." *Aircraft Serv. Int'l*, 779 F.3d at 1083 (en banc) (Berzon, J., concurring) (citing *Summit Airlines, Inc. v. Teamsters Local Union No. 295*, 628 F.2d 787, 793–95 (2d Cir. 1980)). When employees vote on a representative, but the carrier refuses to negotiate, the representative labor group must seek Board certification. *See Summit Airlines*, 628 F.2d

at 795. And, finally, employees may appoint a representative and a carrier may voluntarily choose to negotiate with them.

"Voluntary recognition" is the standard practice under federal labor laws. The Board's handbook provides that a group which has petitioned the Board for a certification may withdraw an application if the group wishes to seek voluntary recognition. *See* National Mediation Board, Representation Manual § 6.0. Similarly, various courts have found that carriers may voluntarily recognize an RLA representative. *See Summit Airlines*, 628 F.3d at 795; *Burlington N., Inc. v. Am. Ry. Supervisors Ass'n*, 503 F.2d 58, 63 (7th Cir. 1974).

Moreover, courts interpreting a comparable section of the National Labor Relations Act (NLRA) have found that employees can "designate" a labor representative under 29 U.S.C. § 159(a) by either acquiring a National Labor Relations Board certification or through voluntary recognition. *Triple C Maint., Inc.*, 219 F.3d at 1153; *Sheet Metal Workers' Int'l Ass'n Local 19 v. Herre Bros.* Inc., 201 F.3d 231, 241 (3d Cir. 1999); *Am. Automatic Sprinkler Sys. Inc. v. N.L.R.B.*, 163 F.3d 209, 219 (4th Cir. 1998); *N.L.R.B. v. Goodless Elec. Co. Inc.*, 124 F.3d 322, 324 (1st Cir. 1997). While courts hesitate to import NLRA standards into the RLA due to differences in the statutory schemes, *see Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383 (1969), a clear voluntary recognition rule serves the same salutary purposes under both statutes. It ensures that both parties are on notice of the legal import of their agreements, and thereby promotes stable labor relations. It prevents the need for courts to engage in post hoc determinations of a labor organization's legal status. And, by requiring contemporaneous evidence that an organization enjoys majority support among the relevant workforce, it

protects the right of a majority of employees to choose their labor representative.

## C.  *Application*

In the present case, AAPAG was not an RLA representative. The parties agree the Board never certified AAPAG under Section 152, Ninth. There is no evidence that AAPAG demanded Allegiant recognize it as the pilots' RLA bargaining agent. To the contrary, evidence showed that AAPAG's status did not come up in pilots' discussions among themselves or with Allegiant. AAPAG did not mention the Railway Labor Act in presentations to new pilots. AAPAG's Constitution and by-laws are silent about its status under the Act. AAPAG's officers testified that they were unfamiliar with the RLA and that they never sought outside legal advice about the status of the group or the enforceability of the Work Rules. The officers never discussed whether they could appeal grievances beyond upper management, or whether they could lead the pilots out on strike. The officers never satisfied statutory filing requirements with the Department of Labor. Materials written by AAPAG's president state that the group was operating "without a current contract" and that the pilots needed more than "a legal version of our 40 page work rules." And the Teamsters, who worked in concert with a pilot organizing committee that included AAPAG officers, took the position during the Board election process that AAPAG was not an RLA representative. AAPAG's officers, who were working with the Teamsters, did not contest their categorization.

There is no evidence below (much less an unequivocal demand for recognition) that AAPAG officers ever told Allegiant they were bargaining as an RLA representative

instead of as a non-RLA employee committee. Both AAPAG's officers and Allegiant's management agreed that AAPAG never presented itself as an RLA bargaining agent. Allegiant's filings with the SEC describe AAPAG as an "in-house association" and the Work Rules as a "mutually acceptable arrangement." That description is in stark contrast to Allegiant's statements that the flight attendants had "voted for representation" and were negotiating "a labor agreement." Finally, while the Work Rules state that Allegiant would change the Work Rules "in coordination with the Allegiant Air Pilot's Advocacy Group (AAPAG), the elected and representative body of the pilot group of Allegiant Air," nothing in the Work Rules mentioned the RLA or constitutes Allegiant's unequivocal recognition of AAPAG's RLA status.

If a labor organization wants to be an RLA representative, it must demand recognition from a carrier; if the carrier will not give it, the group must seek Board certification. Because AAPAG did neither, it was not an RLA representative.

Because AAPAG was not an RLA representative, the Work Rules were not a collective bargaining agreement within the meaning of the RLA.[4] Thus, when the Teamsters and Allegiant met to draft a collective bargaining agreement, there was no agreement in place. We have previously found the RLA does not require a carrier to maintain the status quo during negotiations of an initial labor agreement. *Int'l Bhd. of Teamsters v. N. Am. Airlines*, 518 F.3d 1052, 1057–58 (9th Cir. 2008). The RLA therefore did not prevent Allegiant from

---

[4] The Work Rules may have created an employment contract under Nevada state law, but that question is not subject to our review.

changing the Work Rules, and the district court erred in entering an injunction.

## VI. CONCLUSION

Accordingly, the district court's injunction is **VACATED** and the case is **REMANDED** to permit the Teamsters and Allegiant to continue negotiating a collective bargaining agreement in conformity with the RLA and under the Board's guidance.

Each party shall bear its own costs on appeal.